J-A06022-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TYLER WILLIAM HERNDON | : | |
| | : | |
| Appellant | : | No. 588 WDA 2021 |

Appeal from the Judgment of Sentence Entered March 30, 2021
In the Court of Common Pleas of Mercer County
Criminal Division at No(s):  CP-43-CR-0000569-2019

BEFORE:     MURRAY, J., SULLIVAN, J., and COLINS, J.[*]

MEMORANDUM BY SULLIVAN, J.:                    **FILED: JULY 25, 2022**

Tyler William Herndon ("Herndon") appeals from the judgment of sentence imposed after a jury convicted him of involuntary deviate sexual intercourse, strangulation, unlawful restraint, indecent assault, simple assault, and recklessly endangering another person.[1]  We affirm.

We summarize the factual history of this appeal from the trial transcript. Herndon and T.O. began communicating over Facebook in November 2018. N.T., 10/19/20-10/20/20, at 117-18.  They first met in person in March 2019, when their children, who were friends, had a play date.  ***See id***.  Herndon and T.O. exchanged text messages about their children, fashion, and relationships.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3123(a)(1), 2718(a)(1), 2902(a)(1), 3126(a)(1), (2), 2701(a)(1), 2705.

The day after the play date, T.O. went to Herndon's home with her children and helped Herndon with his computer. *See id*. at 48. According to T.O., Herndon slammed her head against a wall and choked her until one of her children interrupted by asking for something. *See id*. at 48-49. That evening, T.O. texted Herndon and wished him a good night. *See id*. at 102.

The following day, March 17, 2019, Herndon and T.O. continued to text each other, and T.O. arranged to meet him. *See id*. at 51-52 T.O. related that she told her mother, with whom she lived, that she was going to do laundry. *See id*. Herndon picked up T.O. and drove her to his home, where she helped him with his computer and did her laundry. *See id*. at 52-53. T.O. stated that she was working on the computer when Herndon told her he bought her some clothes, which he had left in his bedroom. *See id*. at 53-54.

T.O. went to the bedroom and tried on two pairs of pants, while Herndon was elsewhere in the home. *See id*. at 56-58. According to T.O., the lights suddenly went out in the bedroom while she was trying on the clothes and she found that Herndon was behind her. *See id*. at 58. He grabbed her wrists and bound them together behind her back. *See id*. at 59-60. He then pushed her face down onto the bed and bound her wrists to her ankles. *See id*. at 60. He put a collar with a chain around her neck, a mask on her face, and a metal ring in her mouth. *See id*. at 60-61. Herndon vaginally penetrated her with several objects and then his penis, and used the chain and collar, as well

as his hands, to choke her to near unconsciousness. *See id*. at 63, 65-69. Despite the metal ring in her mouth, T.O. managed to scream out for Herndon to stop. *See id*. at 69-70.

Herndon eventually stopped, untied T.O.'s right hand and ankle, and left the bedroom. *See id*. at 70. T.O. removed the rest of the restraints, got dressed, gathered her laundry, and told Herndon she was leaving. *See id*. at 72-73. She then waited in Herndon's car until he came out and drove her to her mother's house. *See id*. at 73.[2]

T.O. was visibly distraught. *See id*. at 173. When her mother sought to determine why she was upset, T.O. disclosed that Herndon had raped her. T.O. had a friend take her to the hospital approximately two hours after she returned home. At the hospital, sexual assault nurse examiner ("SANE Nurse") Kelly Williamson examined her, and Pennsylvania State Trooper Zachary Julien interviewed her.

Trooper Julien obtained a search warrant for Herndon's home. When he executed the warrant the next day, he recovered items consistent with T.O.'s descriptions, *i.e.*, a used condom, lubricant, restraints, a collar, chains, a metal ring with straps, and sex toys. *See id*. at 243-44, 247. Testing revealed T.O.'s DNA on the sex toys. *See* N.T., 10/21/20-10/22/20, at 9 (indicating that the parties stipulated to the admission of a DNA report); *see*

_____

[2] T.O. did not have a driver's license. *See* N.T., 10/19/20-10/20/20, at 52.

*also id*. at 74 (indicating that Herndon conceded that T.O.'s DNA was on the sex toys). Trooper Julian arrested Herndon. Herndon was charged with numerous offenses relating to the sexual assault.

At trial, T.O. testified that Herndon had physically assaulted her the day before the sexual assault, but that she continued to text him. She explained that she thought Herndon was "odd," but a "nice guy," and that she wanted to be "nice." N.T., 10/19/20-10/20/20, at 46, 94. T.O.'s mother and friend both testified that T.O. told them Herndon had raped her; T.O.'s mother stated when T.O. first returned home, she was shaking and obviously traumatized. *See id*. at 173. Herndon called an expert in forensic nursing to testify that nothing in the SANE report supported the victim's reports to SANE Nurse Williamson and Trooper Julian of being sexually assaulted. The jury convicted Herndon of the above-stated offenses.[3]

On March 30, 2021, the trial court sentenced Herndon to serve an aggregate term of seven years and two months to seventeen and-one-half years in prison.[4] The court noted that the Sexual Offender Assessment Board had determined that Herndon was not a sexually violent predator. Herndon's counsel asserted that he had advised Herndon of his sexual offender registration requirement for committing a tier III offense pursuant to the

_____

[3] The jury found Herndon not guilty of rape and aggravated assault.

[4] The trial court's initial sentencing order, which it later corrected, erroneously stated that its maximum sentence was nineteen years.

Sexual Offender Registration and Notification Act ("SORNA"). *See* 42 Pa.C.S.A. § 9799.14(d)(4) (designating involuntary deviate sexual intercourse as a tier III offense). Herndon timely filed post-sentence motions challenging, in part, the weight of the evidence. The trial court denied Herndon's weight claim. Herndon timely appealed, and both he and the trial court complied with Pa.R.A.P. 1925.

Herndon raises the following issues for review:

1. Whether [the] [t]rial [c]ourt erred and abused its discretion by denying Mr. Herndon's post-sentence motion for a new trial challenging the weight of the evidence . . . [where] the victim's testimony was unreliable and untrustworthy, as it was riddled with inconsistencies and a lack of corroboration.

2. Whether [t]rial [c]ourt err[ed] and committed a mistake of law by imposing an illegal sentence by subjecting Mr. Herndon to automatic lifetime registration under Subchapter H of SORNA/ACT 10 . . ..

Herndon's Brief at 7-8.

Herndon's first issue contests the trial court's denial of his weight of the evidence claim, which implicates the following legal principles governing our review. A motion for a new trial based on the weight of the evidence is directed to the discretion of the trial court, whose role is to determine whether certain facts are so clearly of greater weight that to ignore them or give them equal weight denies the defendant justice. *See Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009) (citation omitted). However, the trial court does not sit as a "thirteenth juror," and should not grant a new trial because of mere conflicts in the evidence or because the court would have reached a

different conclusion than the jury on the same facts. ***Commonwealth v. Widmer***, 744 A.2d 745, 752 (Pa. 2000). "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." ***Commonwealth v. Cramer***, 195 A.3d 594, 600 (Pa. Super. 2018) (citation omitted). Thus, a trial court addressing a weight of the evidence claim assesses whether the verdict was so contrary to the evidence as to shock one's sense of justice. ***See Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013).

An appellate court reviews whether the trial court abused its discretion when it denied a weight of the evidence claim; it does not assess the underlying question of whether the verdict is against the weight of the evidence. ***See id***. at 1054. This Court gives the gravest consideration to the trial court's findings and reasons when reviewing the determination that the verdict is against the weight of the evidence because the trial judge had the opportunity to observe all of the evidence presented at trial. ***See id***. If the record adequately supports the trial court's decision to reject a weight of the evidence claim, the trial court has acted within its judicial discretion. ***See Brown***, 648 A.2d at 1190. ***See also Commonwealth v. Fuentes***, 272 A.3d 511, 517 (Pa. Super. 2022) (noting that trial court's weight of the evidence determination is one of the least assailable reasons for granting or denying a new trial).

Herndon argues that the trial court abused its discretion because T.O.'s behaviors and communications with him before, during, and after the sexual assault on March 17, 2019, "severely undercut her credibility."[5] Herndon's Brief at 19, 22. Specifically, Herndon asserts that T.O.: (1) continued to engage in "flirty banter" with him even after he allegedly physically assaulted her the day before the sexual assault; (2) "lie[d]" to her mother to meet with Herndon alone on March 17th out of fear that her mother would "slut shame" her; and (3) did not immediately run away from Herndon's home or call 911 after the sexual assault but rather finished her laundry and then waited for Herndon to drive her home before reporting the sexual assault to her mother. *Id*. at 20-23. Herndon adds that T.O. told her friend that the clothes Herndon asked her to try on were "sexy." *Id*. at 22. Finally, he asserts that the SANE report revealed no physical injuries to T.O.'s ankles, wrists, neck, or vagina to corroborate her testimony that he bound, choked, and penetrated with foreign objects.

The trial court rejected Herndon's weight of the evidence claim. It stated that its conscience was in no way shocked by the verdicts in light of "the victim's credibility, the subsequent investigation and resulting evidence,

---

[5] In his appellate brief, Herndon does not specify the crime or element of that crime about which T.O. was purportedly not credible. At trial, the defense conceded that Herndon and T.O. had sex and argued to the jury that "[t]he only issue you have to decide is whether or not it was consensual." N.T., 10/19/20-10/20/20, at 74.

the extensive communications between [Herndon] and [T.O.], the findings of DNA evidence which corroborated the testimony, and the testimony of other individuals to the state of [T.O.] subsequent to the incident." Trial Court Opinion, 7/2/15, at 15.

The record supports the trial court's rejection of Herndon's weight claim. T.O.'s testimony about the sexual assault was unwavering. *See* N.T., 10/19/20-10/20/20, at 58-70. Her account of being restrained, strangled, and penetrated by foreign objects was corroborated by the physical evidence recovered from Herndon's home and from DNA testing, and her mother's testimony about her distress after the sexual assault. It was within the province of the jury to reject Herndon's assertions that her contact with him after the physical assault the day before the sexual assault "severely undercut her credibility." *See Cramer*, 195 A.3d at 600 (reiterating that the finder of fact is free to believe all, none or some of the evidence and to determine the credibility of the witnesses). Thus, because the record supports the trial court's reasoning, we conclude that the trial court acted within its discretion when denying Herndon's weight claim.

Herndon next asserts that his SORNA registration requirement constitutes an illegal sentence and violates his constitutional rights.

An illegal sentence claim cannot be waived. *See Commonwealth v. Thorne*, --- A.3d ---, ---, 2022 WL 2231821, at *3 (Pa. June 22, 2022). Challenges to the legality of a sentence involve a narrow category of claims

that the trial court lacked the authority to impose a sentence, including that the sentence imposed: (1) fell outside the legal parameters prescribed by the applicable statute; (2) implicated merger or double jeopardy concerns; (3) violated the rules in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), or *Alleyne v. United States*, 570 U.S. 99 (2013);[6] or (4) involved cruel and unusual punishments. *See Commonwealth v. Lawrence*, 99 A.3d 116, 122-23 (Pa. Super. 2014). The standard of review of constitutional challenges to SORNA II and related illegal sentencing claims is *de novo*, and the scope of review is plenary. *See Commonwealth v. Torsilieri*, 232 A.3d 567, 575 (Pa. 2020); *Commonwealth v. Bickerstaff*, 204 A.3d 988, 995 (Pa. Super. 2019).

It is well settled that a statute is presumed to be constitutional and that the party seeking relief has a heavy burden of showing that the statute clearly, palpably, and plainly violates the constitution. *See Commonwealth v. Manzano*, 237 A.3d 1175, 1180 (Pa. Super. 2020); *see also Torsilieri*, 232 A.3d at 589 (emphasizing that "only the 'clearest proof' of punitive effect can override the legislature's stated intent that the statute be construed as non-

---

[6] *Apprendi* holds that except for prior convictions, a "fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury[ ] and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. *Alleyne* held that the rule in *Apprendi* applies with equal force to facts increasing a mandatory minimum sentence. *Alleyne*, 570 U.S. at 112.

punitive.") (citation omitted). Additionally, the threshold question in establishing whether a sex offender registration statute imposes a cruel and unusual sentence, violates *Apprendi*, or permits a sentence beyond a statutory maximum, is whether the statute is punitive. *See Commonwealth v. Butler*, 226 A.3d 972, 987 (Pa. 2020).

By way of further background, in response to our Supreme Court finding that a former version of SORNA ("SORNA I") was an unconstitutional *ex post facto* punishment, *see Commonwealth v. Muniz*, 164 A.3d 1189, 1223 (Pa. 2017) (plurality), our General Assembly passed Acts 10 and 29 of 2018 ("SORNA II"). SORNA II amended SORNA I to include revised Subchapter H, which governs offenses, like the current one, committed after December 2012. revised Subchapter H contains the legislature's findings that its provisions are nonpunitive and that sexual offenders "pose a high risk of committing additional sexual offenses . . .." 42 Pa.C.S.A. § 9799.11(a)(1), (4).

Our Supreme Court has yet to rule definitively on the constitutionality of revised Subchapter H or determine whether it is punitive. *See Thorne*, 2022 WL 2231821, at *5 (stating that "[t]he question of whether the lifetime registration requirement of [r]evised Subchapter H is punitive in nature and, therefore, part of [Thorne's] criminal sentence subject to various constitutional protections applicable to criminal sentences currently remains open."). In *Torsilieri*, however, our Supreme Court vacated a trial court order finding that revised Subchapter H violated a sexual offenders' right to

reputation by creating an irrebuttable presumption[7] of recidivism and future dangerousness and that the statute was punitive. *See Torsilieri*, 232 A.3d at 587-88, 596. The Court concluded that Torsilieri posed a "colorable" constitutional challenge to revised Subchapter H by presenting research that sex offender recidivism rates are improperly exaggerated and that the registration system increases rather than decreases the danger to the public. *See id*. at 584-85. The *Torsilieri* Court, however, remanded to the trial court for further consideration of whether there was a "scientific consensus" necessary to overturn the legislature's findings concerning recidivism and the effectiveness of the registration and notification provisions of revised Subchapter H, and to reevaluate whether the statute is punitive in light of additional scientific evidence on remand. *See id*. at 587-88, 596.

In this appeal, Herndon asserts that revised Subchapter H: (1) contains an irrebuttable presumption that sexual offenders pose a high risk of recidivism, which violates his due process rights; (2) is punitive, thereby inflicting a cruel and unusual punishment and implicating *Apprendi* concerns; and (3) imposes a registration requirement, which constitutes a "lifetime sentence . . . greater than the lawful maximum for a conviction of the offense"

---

[7] A party claiming an unconstitutional irrebuttable presumption must demonstrate "(1) an interest protected by the due process clause, (2) utilization of a presumption that is not universally true, and (3) the existence of a reasonable alternative means to ascertain the presumed fact." *Torsilieri*, 232 A.3d at 579 (citation omitted).

for which he was found guilty. Herndon's Brief at 28, 31.[8] Although Herndon did not raise this challenge until filing a Pa.R.A.P. 1925(b) statement, we will address the constitutional and statutory claims to the extent they implicate legality of sentences claims. *See Thorne*, 2022 WL 2231821, at *4 (Pa. June 22, 2022) (concluding that Thorne did not waive *Apprendi* and cruel and unusual punishment challenges to Subchapter H by failing to raise them in the trial court).

Following our review, we conclude that Herndon has failed to meet his burden of showing that revised Subchapter H clearly, palpably, and plainly violates his right to due process. Herndon does not establish an "irrebuttable presumption" argument, as he merely references two scholarly articles, which he did not attach to his brief, and does not assert a colorable claim that the legislature's findings are contrary to a scientific consensus. *See Manzano*, 237 A.3d at 1182; *see also Torsilieri*, 232 A.3d at 584-85. Herndon's bare assertions that the registration, notification, and counseling provisions of revised Subchapter H are punitive because they are similar to those held punitive in *Muniz*, also fails to provide the "clearest proof" to override the legislature's stated intent that revised Subchapter H is not punitive. *See*

_____

[8] Herndon adds that he "is aware that this . . . Court has rejected similar arguments[,]" but that he raises the claims now in light of pending constitutional challenges to Subchapter H in our Supreme Court. Herndon's Brief at 31.

*Torsilieri*, 232 A.3d at 589. Because Herndon has not established that Subchapter H imposes a criminal punishment, his sentencing challenges, which allege a cruel and unusual punishment, a violation of *Apprendi*, and the imposition of a penalty over the lawful maximum, must also fail. *See Butler*, 226 A.3d at 987, 993 (noting that *Apprendi* is only implicated if a statute is punitive); *cf. Commonwealth v. Howe*, 842 A.2d 436, 446 (Pa. Super. 2004) (noting that Howe's cruel and unusual punishment claim failed because the registration provisions were not punitive).[9] Thus, we conclude that Herndon's constitutional challenges to revised Subchapter H and his related illegal sentencing claims merit no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/25/2022

---

[9] We add that the majority and dissenting opinions in *Thorne* recognized that construing constitutional challenges to revised Subchapter H of SORNA as an illegal sentence before the statute is demonstrated to be punitive may "place the jurisprudential cart before the horse." *Thorne*, 2022 WL 2231821, at *5 (Baer, C.J., dissenting); *see also id*. at *5 n.14 (majority stating that it does "not necessarily disagree" with the dissent's characterization).